**UNITED STATES of America**

v.

**Carl COOPER, Defendant.**

**No. Crim. 99–0266 (JHG).**

United States District Court,
District of Columbia.

Feb. 1, 2000.

Steven R. Kiersh, Washington, DC, Francis Darron Carter, Washington, DC, for Carl Cooper, defendant.

Kenneth Leonard Wainstein, U.S. Attorney's Office, Washington, DC, for U.S.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

The 48–count indictment charging defendant, Carl Cooper ("Cooper"), with various racketeering acts of robbery, murder, conspiracy and firearms offenses was filed on August 4, 1999, and a jury trial has been scheduled for April 10, 2000. Mr. Cooper is eligible to receive the death penalty for three of the charged offenses. The record reflects that the defense was to have presented its position on the death penalty to the Attorney General of the United States on January 24, 2000. The Attorney General has not made a decision as to whether the government will pursue that ultimate penalty.

Currently before the Court are Cooper's four motions to suppress statements, wire interceptions, physical evidence and photographic identification. On January 12, 13, 18 and 19, 2000, the Court heard testimony from four government witnesses and one witness called by the defense on the motion to suppress statements, and from one government witness on the motion to suppress photographic identification. As is his constitutional right, Cooper did not testify or provide an affidavit. In addition, the Court heard argument from counsel on all four motions. Based on the pleadings filed by the parties, the argument and testimony given in open Court, and all matters considered, for the reasons discussed below, each of the four motions is denied.

### I. Motion to Suppress Statements

Mr. Cooper was arrested by FBI agents outside of his home in the District of Columbia on March 1, 1999 pursuant to an arrest warrant issued by Commissioner Gary F. Byrd of Prince George's County, Maryland ("PG County"). The arrest warrant was based on Cooper's alleged involvement in the 1996 shooting and robbery of PG County police officer Bruce Howard. Cooper made verbal statements to FBI agents while in their custody from the time of his arrest until his extradition hearing the following afternoon in the Superior Court of the District of Columbia. After the extradition hearing, Cooper was transported to PG County where he gave several verbal statements, and seven written statements (plus a correction) to PG County police officers. He was then returned to the District of Columbia where he gave additional verbal statements to the FBI agents. He seeks to have all of his statements suppressed.

### A. Background

Witnesses for the government included FBI Special Agent Bradley Garrett ("S/A Garrett" or "Garrett"), PG County Detective Richard Fulginiti ("Det. Fulginiti" or "Fulginiti"), PG County Sergeant Joseph McCann ("Sgt. McCann" or "McCann"), and PG County Detective Troy Harding ("Det. Harding" or "Harding"). The defendant called FBI Special Agent Stephanie Yanta ("S/A Yanta" or "Yanta"). The Court has observed the demeanor and heard the testimony of these witnesses, and finds each of the five to be highly credible and extremely persuasive.[1] The testimony of these officers was thoughtful, unhesitating, calm, and fully consistent with not only the officer's own individual

---

1. The individuals who questioned Cooper are experienced law enforcement officers. S/A Garrett testified he has been with the FBI for fifteen years, with the last ten in the District of Columbia office. Prior to that time, he was a federal probation officer for ten years. Sgt. Fulginiti testified he has been with the PG County Police Department for seventeen years. Sgt. McCann testified he has been with the PG County Police Department for eight years. Det. Harding testified he has been with the PG County Police Department for ten years, and was a Greenbelt City police officer for six years prior to that. S/A Yanta has considerably less experience than the other officers—she testified she has been with the FBI since March 1998—however, she observed and took notes from a television monitor and speaker set up in a nearby room and, except perhaps to introduce herself, did not speak to Cooper.

prior memorializations, but also with each other's testimony.

### 1. Interview at the FBI Field Office

On March 1, 1999 at approximately 6:20 p.m., Cooper was in his automobile with his five-year old son in front of his house in Northeast Washington when Agent Garrett and FBI Special Agent Bob Oxley ("S/A Oxley" or "Oxley") pulled up next to Cooper and, after Cooper exited the vehicle, placed him under arrest.[2] According to Garrett, every effort was made not to handcuff Cooper in front of his son. There was no force used during the arrest, and Cooper did not resist in any fashion. In fact, Cooper later thanked Garrett for being "low-key" about the arrest. The media was present when Cooper was arrested, although it is not clear who contacted them.

Cooper was transported to the FBI Field Office in Northwest Washington by Garrett and Oxley, where he was questioned from approximately 8:20 p.m. until 3:24 a.m. Several individuals, including Detective James Trainum from the Metropolitan Police Department ("Det. Trainum" or "Trainum"), S/A Yanta, Sgt. McCann, Assistant United States Attorney Kenneth L. Wainstein ("AUSA Wainstein"), and United States Attorney Wilma A. Lewis, observed all or a portion of the interview through a television monitor and speaker in a nearby room. With the exception of AUSA Wainstein, none of these individuals entered the interview room. Cooper could not see these individuals, nor was he advised they were there. It was S/A Yanta's responsibility to take notes of the entire interview. She wore a headphone and focused on what was occurring in the interview room. Her handwritten notes, as well as the FBI FD–302 investigative report she prepared, were admitted into evidence at the hearing on Cooper's motion to suppress statements.

S/A Garrett testified that Cooper's restraints were removed when he entered the room. As part of the booking process, Cooper was asked some preliminary information concerning his family and employment history and criminal background. He advised the agents he was concerned about the effect his arrest would have on his job. During this booking process, Cooper volunteered that he had conferred with a lawyer who advised him that all the evidence against him was circumstantial, and he stated he wanted to take a lie detector test.[3] Garrett was unclear whether Cooper was talking about the shooting of Officer Howard, the Starbucks murders, or some other aspect of the case.[4] S/A

---

2. Although Cooper was arrested solely on the PG County charge, the FBI was part of a joint task force consisting of federal, District of Columbia, and Maryland authorities. According to the government,

> it became apparent early in the investigation into the defendant's enterprise that he and his confederates were responsible for crimes in the District of Columbia, Maryland and Pennsylvania. Once the investigators recognized the cross-jurisdictional aspect of the enterprise, they contacted law enforcement officers in the affected jurisdictions and engaged in a cooperative effort to investigate those crimes.

Govt.Opp. at 86.

3. This was not the first time Cooper indicated his intent to take a lie detector test. In late fall of 1998, Det. Trainum and Garrett were in a vehicle near Cooper's house when Cooper pulled up in a car alongside them and asked why they were harassing him. Garrett replied they were working on homicides in the area and just happened to be near Cooper's house. There was some discussion of a polygraph test, Garrett told Cooper he was not prepared to give him the test, and Cooper drove off. On another day, Cooper accompanied a woman named Kelly Hood to an interview at the United States Attorney's Office. Cooper apparently asked to see AUSA Wainstein so he could take a polygraph test. It is unclear to whom Cooper spoke, although Garrett testified that to his knowledge Cooper did not speak to anybody that day concerning the polygraph test. Tr. (1/12/00) at 238:17–20.

4. Garrett testified on cross-examination that he knew Cooper had talked with a lawyer about a "gun that was taken." Tr. Jan 12, 2000 161:12–17.

Garrett told Cooper they would talk about it after they finished the booking process.

At approximately 9:00 p.m., Garrett told Cooper he was being charged with the 1996 shooting and robbery of an off-duty police officer in PG County. After Cooper denied his involvement in that incident, Garrett told Cooper he wanted to talk about Starbucks. Cooper wanted to talk, and signed a written *Miranda* waiver, which Garrett had also read verbally to Cooper. Garrett testified that Cooper did not hesitate in any manner when he reviewed and signed the *Miranda* waiver, nor did he express any concern about what he was doing. Cooper denied involvement in the Starbucks case, claiming murder was "not his style." He said the victims at Starbucks could have been controlled by hitting them in the head or using pepper spray. Cooper admitted past involvement in robberies and narcotic sales, and when asked why his name kept coming up in connection with Starbucks, he claimed it was because of his reputation in the community as a robbery consultant. Cooper stated people are motivated to name him because of the reward being offered, and also because informants could make deals to help themselves.

Cooper acknowledged that he has in the past gone with his family into the Starbucks store where the murders occurred. He did not recall being in the store the weekend the murders happened and, when asked by Garrett why his fingerprints were found inside the store after the murders, he had no explanation.[5] Cooper said he went to the Starbucks about two weeks after the murders and put flowers on the memorial. He stopped going because too many people were accusing him of committing the murders and he did not want to be perceived as a criminal returning to the scene of the crime. Cooper stated that he never knew anybody who worked for Starbucks and that he would never commit a crime in Georgetown because of the large volume of people and police on the streets. Cooper stated that two individuals who were his close associates came to him for advice on robbing the Georgetown Starbucks. Cooper said he counseled these individuals against robbing that Starbucks. He thought they robbed a tire place in Maryland instead.[6] Cooper was concerned about being perceived as a snitch and possibly getting killed. S/A Garrett testified that up to this point in the interview, Cooper was "upbeat, positive, very verbal, you know, wanting to express, you know, his thoughts and ideas and beliefs very freely and voluntarily." Tr. (1/12/00) at 41:24–42:4.

At approximately 11:24 p.m., Cooper became emotional, cried, appeared "defeated," and said he wanted to go to PG County to "get this over with." [7] This "despondent phase," as S/A Garrett termed it, lasted no more than five minutes, and is "common in people who want to admit what they've done." Tr. (1/12/00) at 235:5–11. Garrett talked some more to Cooper and asked him if he still wanted to take a polygraph. Cooper responded "I just want to go back. I'm in it for life. I'm in dirt. Every time somethin' goes down, I'm in it. I'm destined to do dirt. I quit. I know what I've done. I'm constantly trying to defend myself, defend my name." Govt.Exh. 1 at 8. He then denied

---

5. Cooper's fingerprints were not found at the Starbucks store. Garrett testified he used this information because he believed Cooper would accept as true a statement that his prints were found on the scene. He believed this because Cooper had mentioned to another individual during a law enforcement intercepted telephone conversation that Cooper thought the police had his fingerprints from Starbucks.

6. Cooper has been charged in this indictment with conspiracy to rob a tire shop in Maryland. The government alleges that Cooper and other individuals planned to rob the shop, but did not do so because Cooper noticed an ATM machine nearby and became concerned about being filmed on camera.

7. See Section 1.B1(a) for the entire content of Cooper's statement that he wanted to go to PG County.

his involvement in both the shooting of Officer Howard and the Starbucks murders, claiming "talkin' to you [Garrett] isn't gonna help me out. I'm tired. I'm tired of the bullshit. I can't do right. I didn't do this shit, I didn't do the P.G. shit." Govt.Exh. 1 at 9. Garrett continued to talk to Cooper, asking him what it would take "for [Cooper] to tell us what you've done in the last six (6) years." *Id.* Cooper replied that he did not do the crimes he is being accused of, that he was careful to cover his tracks or avoid detection whenever he committed a crime, and, that everything he did, he did by himself. Cooper was asked if he still wanted to take a polygraph, and replied "no," that there was "no point."

Cooper and Garrett continued to converse about Cooper's participation in robberies in general, with Cooper stating that he did not see any reason to wear a mask, that he always stole cars for use during the robberies, and that he did not do robberies in D.C. because they were too close to home. Specifically, Cooper discussed a bank robbery he did not commit, but he helped to plan it and shared in the proceeds.[8] He also stated that his confederate, James,[9] shot the PG County police officer.

Cooper stated that while he initially agreed to take a polygraph test he did not want to take one at this point because he

only had knowledge after the fact and it would be no help to the authorities. Cooper said "if I did it, I would say let's work out a deal. You've got me. I'm not gonna make a deal for something I didn't do." Govt.Exh. 1 at 12. Garrett asked him hypothetically what type of deal he would request and Cooper replied that he would "ask not to be put to death." *Id.* The subject of conspiracy and federal charges came up in the conversation and Garrett brought AUSA Wainstein into the interview room for a brief period of time, no longer than 22 minutes.[10] AUSA Wainstein spoke to Cooper in the presence of S/A Garrett. He answered Cooper's questions concerning conspiracy and explained the "laws of conspiracy" and "how conspiracy is defined in the federal system." Tr. (1/12/00) at 203:5–11.[11] AUSA Wainstein then left the room.

Garrett left the room shortly thereafter and Metropolitan Police Detective Tony Patterson came in to talk to Cooper about taking a lie detector test. Cooper stated he did not want to take the test because he was being "spiteful" and nobody wanted to listen when he was ready to talk. He said his life was over and he would get nothing out of taking a polygraph. The interview ended at 3:24 a.m. and Cooper was taken to the Central Cell Block.[12]

---

8. Cooper has been charged in this indictment with the robbery of the Chevy Chase Bank in Maryland on October 1, 1996. The government alleges that Cooper helped plan the robbery and shared in the proceeds.

9. The Court will usually follow the government's policy of using only first names to protect those individuals.

10. Garrett testified that AUSA Wainstein was in the interview room for no more than five minutes. However, Yanta's notes, and her testimony, note that AUSA Wainstein was in the room from 1:29 a.m. through 1:51 a.m., a period of 22 minutes.

11. The FD–302, which was prepared by S/A Yanta, and signed by S/A Yanta, S/A Garrett, S/A Oxley, and Det. Trainum, states that "Ken Wainstein explained the indictment against Cooper." Govt.Exh. 1 at 12. Garrett stated

the use of the word "indictment" is incorrect because Cooper was never shown an indictment. Yanta testified that AUSA Wainstein did not show Cooper an indictment or any other documents, and that he never advised Cooper he was under indictment. Tr. (1/19/00) at 39:1–6, 46:6–10.

12. Although not introduced into evidence at the hearing, an exhibit to Cooper's motion to suppress statements is an internal e-mail issued by Lieutenant McAllister of the Metropolitan Police Department to other officers at the conclusion of the interview for the stated purpose of providing an update. Lieutenant McAllister notes the progress of the case, that Cooper was arrested and searches were conducted, that FBI and MPD officers interviewed Cooper for nearly six hours, that "nothing noteworthy was obtained," that Cooper is a "hard head" and that they

Garrett testified he never raised his voice to Cooper except to emphasize a particular point he did not understand or that needed clarification. He stated Cooper was appropriate and polite with all the detectives except for the one time when he briefly became despondent. Cooper was on a first name basis with the detectives. He called S/A Garrett by his first name and S/A Oxley by his nickname "Ox." They called him "Carl." Cooper was in good physical condition, never complained about being in pain except a brief mention that his stomach was bothering him, and did not appear to be suffering from any mental or emotional problems. Garrett testified that Cooper seemed tired, or perhaps just worried, at the end of the interview, hanging his head and leaning over in the seat. No threats, promises, or suggestions on what to say were made to Cooper, no force was used and no officer ever displayed a weapon to Cooper. Cooper never expressed fear. Cooper never asked for a lawyer, and never requested to discontinue the interview. He was given bathroom breaks and food and drink. Garrett testified that Cooper was very articulate, had an excellent vocabulary, and was very responsive, focused and able to keep up with the conversation. Cooper has had some college education at a junior college in Montgomery County. Cooper did not ask for, and was not offered the opportunity to use the telephone or to speak with any family member during this time.

### 2. Extradition Hearing

On March 2, 1999 at 11:53 a.m., Cooper appeared before a Commissioner in the Superior Court of the District of Columbia for an extradition hearing. Eduardo Juarez ("Juarez"), then a staff attorney with the Public Defender Service for the District of Columbia, was appointed to represent Cooper at the extradition hearing. At that brief hearing, Juarez advised the Court that Cooper waived extradition, and stated

> I'd also for the record like to assert Mr. Cooper's rights under the Fifth and Sixth Amendments, to have counsel present during questioning by the government on this or any other matter. In particular, my understanding is that Mr. Cooper has been interrogated by D.C. police officials as well as D.C. prosecutors with regard to some alleged crimes that happened in D.C. And I would assert Mr. Cooper's rights to have counsel present during questioning on that matter and he also wishes to assert his right to remain silent.

Defense Exhibit 2 at 2–3. While he did not testify at the suppression hearing, Juarez has submitted an affidavit stating that when he made the statement to the Commissioner, he was aware Cooper might be charged with the Starbucks murders.[13] He stated he spoke with Cooper and discussed with him his right to remain silent. He said Cooper's intention was to assert his "Fifth Amendment privilege as he did not desire to answer any questions posed to him by law enforcement about any criminal activity that may have occurred in any jurisdiction." Id. The affidavit states that Juarez intended the privilege to apply to all jurisdictions that might question Cooper about any matter. Juarez lastly noted he was not contacted by any law enforcement official with respect to any statements Cooper was offering, and had he been so contacted he would have advised Cooper not to make any statements without the presence of counsel. There is no indication that Juarez had any contact whatsoever with Cooper or anyone on Coo-

---

"pulled the plug around 0330 and Carl [Cooper] refused the polygraph." Mot. to Suppress Exh. 8. Lieutenant McAllister also noted that United States Attorney Wilma Lewis monitored the interviews until nearly 2:00 a.m. He noted neither the time of her arrival nor whether she consistently monitored the interview.

13. The affidavit was attached to Cooper's motion to suppress statements, but was never moved into evidence at the hearing.

per's behalf after the extradition hearing terminated.

### 3. Travel to Maryland

After the extradition hearing, Cooper was transported, without the presence of counsel, to Maryland by PG County Detective John Piazza ("Det. Piazza" or "Piazza") and Det. Fulginiti. Both Piazza and Fulginiti, who were instructed only to pick up Cooper and bring him to PG County, were present in the courtroom at Cooper's extradition hearing. Neither Fulginiti nor Piazza were involved in the investigation of the Officer Howard matter or the Starbucks murders. Cooper was in handcuffs and leg cuffs when he was placed in the car. Piazza drove the vehicle, with Cooper sitting in the front seat next to him, and Fulginiti sitting in the back directly behind Cooper. Fulginiti testified that Cooper appeared to be physically fine and did not complain of any pain or sickness. Without any prodding by the officers, Cooper started talking almost immediately after he got in the car. Piazza commented to Fulginiti that he was going to take New York Avenue back to Maryland and Cooper suggested an alternate route, which they took. Cooper told the officers that S/A Garrett and Det. Trainum were trying to get him to admit he was involved in Starbucks and that he was initially going to take a polygraph and changed his mind. He then asked if there was any way PG County could give him a polygraph test. Fulginiti advised Cooper that neither he nor Piazza were involved in the case.[14] Fulginiti inquired if Cooper was hungry—it was just after noon—and Cooper replied that he had been offered food but didn't eat it and he was now hungry. Cooper then continued to talk about being wrongfully a suspect in the Starbucks case. The officers did not question him. At no time did Cooper state he wanted a lawyer or that he did not want to talk. Fulginiti testified

that Cooper was very talkative and had a lot of "nervous energy."

### 4. Questioning in P.G. County on March 2, 1999

When they arrived at the PG County Criminal Investigations Division ("PGCID"), at approximately 12:47 p.m. on March 2, 1999, Cooper was taken through the back door because of the media attention in the front of the building. He was placed in an interview room with carpeted floor and walls and cushioned chairs. Fulginiti then left the room and went to a meeting. Sgt. McCann came into the room at approximately 1:10 p.m., introduced himself to Cooper, removed Cooper's handcuffs, and shook his hand. As McCann was asking Cooper for biographical information, Cooper "came across somewhat eager wanting to talk about Starbucks. He kept bringing it up." Tr. (1/13/00) at 85:24–86:1. McCann tried to continue asking Cooper biographical questions, but Cooper was "visibly upset" and wanted to talk about how Det. Trainum was accusing him of committing the Starbucks murders. At that point, McCann read Cooper his *Miranda* rights, and Cooper stated he understood those rights. McCann asked Cooper if he wished to talk without a lawyer present and Cooper responded "yes." He asked Cooper if he had been forced to talk or threatened in any manner and Cooper replied "no." Cooper also advised that he was not under the influence of drugs or alcohol, and had attended six to eight months at Montgomery County Junior College.

McCann told Cooper that he wanted to talk about the shooting of Officer Howard. He advised Cooper they had witnesses and weapon ballistics tests that implicated him. Cooper replied, without elaboration, that it was not his gun used in the shooting, that the D.C. police switched gun barrels and were trying to frame him. McCann ad-

---

14. In fact, the only information Det. Fulginiti had at that point about the Starbucks case

came from the television and the news media.

vised Cooper the gun was identified by the firing pin, not the gun barrel. Cooper did not respond directly, instead stating he wanted to prove he wasn't involved in Starbucks and would talk about Officer Howard later. McCann advised Cooper that PG County had a computerized voice stress analysis test ("CVSA") which was similar to a polygraph.[15] Although both McCann and Fulginiti were authorized and trained to give the CVSA test, McCann thought it would be better at that point to have Fulginiti give Cooper the test. McCann called Fulginiti from his meeting, briefed him for approximately fifteen minutes on the Starbucks case, and left him with Cooper. As Fulginiti was attempting to explain the test procedure, Cooper asked numerous questions about what would happen if he passed the test, and whether the charges would be dropped. Fulginiti gave Cooper verbal *Miranda* warnings, which Cooper stated he understood and waived. Fulginiti felt that Cooper was not ready to take the test because he had so many questions, so Fulginiti advised Cooper he could not run the test right then, but they could talk. Cooper wanted assurance that if he cooperated the information he gave would be relayed to the United States Attorney and the Maryland authorities. Fulginiti assured him he would relay all the information. Fulginiti then explained to Cooper that Cooper was in Maryland because he was being charged with the robbery and shooting of Officer Howard. Fulginiti elaborated that Officer Howard, who was off-duty, and a woman were "embracing" in a parked car in the woods when someone attempted to rob them. Officer Howard was shot in the process. Cooper said PG County "already had the gun" and proceeded to give Fulginiti his version of what happened. Cooper agreed to provide a written statement and Fulginiti produced a written *Miranda* waiver, which Cooper read and executed.[16]

15. The CVSA test consists of a microphone that is pinned to the test taker's shirt and a recording instrument that is sensitive to voice modulation. The test taker responds yes or no to formatted questions. The formatted questions are based on the type of crime committed, with murder cases involving relevant questions (do you know who, did you, and do you suspect who), irrelevant questions (is your car blue, is today Wednesday), and a control question (have you ever gone over the speed limit). The responses are then reduced to a chart, with certain patterns indicating deception. The test administrator goes through the questions once to familiarize the test taker with the procedure. Those results are not read. The questions are then read a second time, and the answers are read and interpreted by the test administrator. A second person trained in the administration of the test then independently reads the test results and renders an opinion without knowing the conclusions of the first test administrator. The parties agree that CVSA test results are not admissible in Court.

16. The procedure for each of the statements was the same. First Cooper would give a verbal account. He would then sign a written *Miranda* form waiving his rights. Each written *Miranda* form contained the standard written *Miranda* rights, which Cooper was asked to read aloud. The standard rights were followed by four questions requiring a response and initials: whether Mr. Cooper understood his rights, whether he wanted to make a statement without a lawyer, whether he had been promised anything or threatened in any way, and whether he was under the influence of drugs. The police officer read each question to Cooper, and then Cooper himself checked off his response to each question and initialed it. The entire form was then signed by Cooper and the law enforcement officer witnessing. Cooper checked off on each waiver that he understood his rights, that he wanted to speak without a lawyer, that he was not promised anything or threatened in any manner, and that he was not under the influence of alcohol or drugs. The waiver also contained a section for the officer to indicate Cooper's education. In each one, there is mention that Cooper has some college education. Cooper was then left alone (in most, if not all instances) to write the statement. Once Cooper was finished with the written statement, the officer involved read the statement and asked Cooper specific questions. The officer would write down the question and the answer and Cooper would initial each answer. In a few instances, Cooper made changes to the answers the officers wrote down. Cooper and the interviewing officer then signed each page of the statement, including the written questions and answers.

Cooper was then left alone to write the first of what would ultimately be seven written statements.

*Written Statement Regarding the Shooting of Officer Howard*

On March 2, 1999, commencing at approximately 4:40 p.m., Cooper wrote a statement detailing the following account. On a date he does not remember, between midnight and 4:00 a.m., he was walking home after being dropped off by a person he refused to name.[17] As he was walking through the woods, he noticed a parked car containing a man and woman having sexual relations. He walked up to the car to be "nosey" and noticed a wallet in the back pocket of the man who was laying on the front seat with his pants down. As Cooper approached the vehicle, the woman in the car saw him and screamed. The man rolled off the woman and yelled at Cooper to take the money but not to hurt them. Cooper pulled out his gun, a 9 millimeter his wife purchased for him. The man "started going crazy" and Cooper responded that he wasn't going to hurt anybody and he just wanted the money. The man was "*sooooo* panicky" (emphasis in original) that Cooper started getting nervous and almost left the scene. The man finally agreed to give Cooper the money and reached down into his pants (which were still around his ankles). As Cooper leaned into the car, the man punched him in the face. The man was able to "turn the gun around" and took a shot at Cooper while the gun was still in Cooper's hand. The bullet missed Cooper but shot a hole through the car window. Cooper regained control of the gun and let the woman out of the car. When the woman got out of the car, the man "jumped across the seat" and started "beating the shit out of me [Cooper] and trys [sic] to take the gun." There was some wrestling and the gun went off and

the man fell to the ground yelling that he had been shot. Cooper was afraid but knew the guy was all right because he was able to talk and evaluate his situation. Cooper had another gun, a .32 caliber pistol that he purchased on the street for $30 approximately five months earlier. This gun fell out of his pocket when he was wrestling with the man in the car. Cooper ran home after the man was shot. He did not call 911 because there were police cars swarming all around. He did not learn until the next day the man in the car was a police officer who had called for back up assistance.

5. *Continued Questioning in PG County on March 2, 1999*

After Cooper finished the written statement regarding Officer Howard, Fulginiti told Cooper it would be a good time for Cooper to provide any information on other criminal activity in PG County. In response, Cooper gave statements concerning the robberies of a pizza shop, a bank, and a massage parlor. Fulginiti had no familiarity with any of these robberies. Rather than writing the account himself, Cooper told Fulginiti to ask him specific questions. Fulginiti would ask the question, write it down on paper and show it Cooper. Cooper would then answer the question, and Fulginiti would write down Cooper's answer. Cooper then read each answer, initialed it, and signed the completed statement. This was the only statement Cooper did not write himself (excluding the question and answer portions of the written statements).

*Written Statement Concerning Robberies of Pizza Shop, Massage Parlor and Bank*

On March 2, 1999 at 8:48 p.m., Cooper gave a statement concerning his involvement in several robberies. The first incident he discussed was a robbery at an

---

17. Cooper gave another written statement concerning this shooting on March 4, 1999 at 12:25 a.m. He "corrected" his prior statement and wrote that he drove up to the scene in his mother's car with his friends Earnest and

Smokey. The group intended to "shoot the guns" when they noticed the parked car in the woods and decided to rob the people inside. Cooper approached the parked car while Earnest and Smokey waited.

Italian pizza shop on New Hampshire Avenue in the District of Columbia. Cooper stated he stole a car and James and Haley (James' girlfriend) drove off in it and returned an hour later advising they had robbed the Italian pizza shop on New Hampshire Avenue across from Pops & Son. James was angry with Cooper because the car was smoking and not running well. Cooper did not know that James and Haley intended to rob the pizza shop; he thought they were driving to Pennsylvania. Cooper did not see James with a gun and he did not receive any money from the robbery.

The next incident Cooper discussed was a bank robbery in Maryland. James and Haley were at Cooper's house and advised they were going out. They did not say where they were going. Later on, James told Cooper he had dressed up like a woman and he and Haley robbed a bank in Maryland with the assistance of James' "play sister" Nicki, who was a teller at the bank. James gave Cooper $1,000 from the proceeds of the bank robbery as a thank you for letting James and Haley stay at his house. When Cooper heard about the bank robbery he evicted James and Haley from his house and they never came back. Cooper did not see a gun and did not know where James got female clothing. James advised Cooper he dumped the clothing in the trash before he got on the Metro. Cooper claims James got the idea to dress up like a woman from a movie involving four female bank robbers.

Cooper next discussed the robbery of a massage parlor in Pennsylvania. Cooper, James, Haley, Earnest and two others were in Harrisburg, Pennsylvania and neighboring areas visiting strip clubs and drinking free beer. They were driving in two cars, one stolen and one owned by Earnest. The group ended up at a massage parlor some time after dark. Cooper does not remember what time of year it

was, but remembers it was not cold outside. They knocked on the back door of the massage parlor and when the manager answered, James pulled out his "long handgun that said 8 millimeter on the side" and proceeded to rob the place. Nobody else in the group had a gun. Cooper was the lookout and declined James' request for him to frisk everyone. James frisked the owner and "freaked out" when he found a gun, accusing the owner of planning to shoot him. A female employee at the massage parlor accused James of biting her breast and this caused some friction between James and Haley. James kept the owner's gun and money, and stole a pair of tennis shoes. Cooper said he gave these statements because he wanted to "come clean" and "show cooperation." [18]

6. *Questioning in P.G. County Evening of March 2 into Early Morning March 3, 1999*

After discussing the robberies, Cooper initiated a conversation about Starbucks and talked about taking the CVSA test. Fulginiti called in Sgt. McCann to talk to Cooper. Fulginiti testified that during the time he was with Cooper, he never raised his voice or threatened Cooper, never used any force or exhibited his weapon (which he did not bring into the interview room), and never made any promises other than in response to Cooper's inquiry, that he would advise the District of Columbia and Maryland authorities about Cooper's cooperation. Fulginiti testified that Cooper seemed calm and relaxed, and never complained of being sick or in pain, except one incident where he said he had a headache and Fulginiti gave him some aspirin. Cooper was given bathroom breaks, food and drink. Cooper never asked for a lawyer, and never indicated he did not understand his rights, or that he wanted to stop talking. Fulginiti testified that Cooper is in-

---

**18.** Cooper has been charged in the indictment with robberies of the massage parlor and piz-

za shop, and conspiracy to rob the bank.

telligent and articulate, and his answers were responsive and thoughtful.

At approximately midnight, McCann read Cooper his rights and Cooper executed a written *Miranda* waiver.[19] McCann gave Cooper the CVSA test. The results were interpreted by both McCann and Fulginiti, who independently of the other concluded that Cooper showed signs of deception in his answers to the following questions: "Did you shoot the people at Starbucks?" and "Do you know who shot the people at Starbucks?" McCann testified that Cooper, when advised of the test results, started to breathe heavily and began to sweat.[20] Cooper sat on the floor, and put his hands over his face. McCann told Cooper he thought it was interesting that Cooper and one of the victims at Starbucks both knew a man named Keith Covington. Cooper thought for a moment, composed himself, and put the blame on Covington, stating that it was an inside job and he, Cooper, was only the driver. Cooper gave a verbal statement concerning Starbucks to Det. Harding, and agreed to write his version of the events, which would become the first of three written statements concerning the Starbucks murders.

*First Statement Concerning the Starbucks Murders*

On March 3, 1999 at 1:12 a.m., Cooper gave a written statement concerning his involvement in the Starbucks murders. He claimed that Keith Covington ("Covington"), approached him a month before the murders with the idea of robbing the Starbucks in Georgetown. Covington had a friend who worked there and would assist from the inside. Covington approached Cooper because Cooper "knew about robberies, [ ] was excellent behind the wheel of a car, and [ ] could keep [his] mouth

closed." Cooper became interested when he learned it would be an inside job performed on the weekend when there was a lot of money in the store. Cooper agreed that he would drive the getaway car and sit in the car while Covington committed the robbery. The plan was that Covington's friend would let Covington in the store, play the victim, and then get the other employees to cooperate. Covington would then escape with the money and the friend would get his share later on. Cooper contacted Earnest and told him the plan, but then quickly regretted it because Covington and Earnest did not know each other. Cooper then told Earnest that it was a stupid idea and never brought it up again. Cooper went to the Starbucks on a Sunday morning to "check it out not knowing that the robbery would go down that night." At around seven or eight that Sunday evening Covington knocked on Cooper's door and told him it was time to commit the robbery at Starbucks. Cooper was already dressed in black and Covington was wearing "dark blue knit sweat pants, boots, and a plaid shirt/jacket." Cooper did not bring a gun because it was an inside job and he didn't think he would need it. Cooper drove his mother's car to the location and parked it up the street. The original plan was to steal a car, but as they rode around looking for one "Covington was nervous and anxious," so he agreed to use his mother's car as long as it was parked up the street from the Starbucks. He and Covington talked for awhile about being in prison and about how much money they were going to get from the robbery. At no time did Cooper see a mask or a gun on Covington. Cooper stayed behind in the car while Covington went into the Starbucks. After approximately five minutes to a half hour of being inside the Starbucks, Covington ran

---

**19.** At this point, Cooper advised McCann that "Fugi already read me my rights." Fugi is the nickname for Det. Fulginiti. The record reflects that Cooper was on an immediate and familiar first name basis with each of the police officers.

**20.** Det. Harding, who was present in the interview room during this time, testified that Cooper began to shake, unbutton his shirt, and was visibly upset. Prior to that time, he had appeared alert, calm, injury-free and sober.

down the street, jumped into the car and told Cooper to pull away. Cooper did not hear any shots or see anything. Cooper sped away and asked Covington what happened and where the money was. Covington looked at Cooper "with a frowned up face and said he couldn't get it." Cooper then dropped Covington off and never spoke about the incident again. He learned about the murders on the news the next day. He claims he was afraid to say anything because Covington knows where he and his family lives, and Covington and his friends are known for violence and drug dealing.

### 7. Interview at PG County on March 3, 1999

After Cooper gave the first Starbucks statement, he went to sleep at approximately 3:30 a.m. Cooper slept until approximately 2:20 p.m., when McCann and Harding resumed the interview. Cooper was asked if he was hungry, but he responded that he was too upset to eat because he knew he was in a lot of trouble.[21] Cooper was shown a photograph of an individual whom he identified as Covington. McCann and Harding advised Cooper that they believed Cooper was inside the Starbucks, and that they would be looking for Covington and needed to know the truth. They also mentioned that they thought Cooper's fingerprints had been found inside the Starbucks.[22] Cooper admitted he was inside the Starbucks but claimed he did not shoot anybody. Cooper was again given *Miranda* warnings, and he signed a written waiver. He then wrote the second statement concerning the Starbucks incident.

### Second Statement Regarding the Starbucks Murders

On March 3, 1999, commencing at 3:29 p.m., Cooper wrote the following statement. Cooper said he "stole" his wife's gun, a 9 mm handgun currently in police custody, and had it in his possession at the time. Covington had two guns in his possession. He said he and Covington walked in the front door at the Starbucks, and Covington put a gun to his friend's head, told him it was a robbery, and the friend let them into the store. The friend told the other "two white employees" to cooperate. While Covington kept an eye on the employees downstairs, Cooper went upstairs to make sure nobody else was in the store. When he returned, he found Covington and the female employee arguing while Covington's friend was in the back with the other employee. The female employee did not want to give Covington the keys to the safe. While they were shouting at each other, Cooper kept an eye on the door. While he was looking out the door onto the street, he heard two shots. He turned around and no longer saw the female employee. Covington's friend then came running into the room. Covington took him to the back room and disappeared from Cooper's sight. Cooper then heard four more shots. Cooper never fired his gun in the store. Covington then ran into the room and he and Cooper ran out the door and into the car. Cooper was afraid the entire time because he thought Covington might shoot him. Nothing was said in the car. Covington had some blood on him and Cooper was concerned that it would stain his mother's car. After he dropped off Covington, Cooper went to a car wash and vacuumed and cleaned the

---

21. Cooper did eat later. He was given spaghetti and meatballs, salad, bread and butter, and two sodas at approximately 7:45 p.m. The record shows Cooper received ample food and drink while he was being questioned in PG County. Meals included a McDonald's double cheeseburger, fries and a soda one occasion, and chicken and rice soup, bread and orange juice on another. In one instance, Det. Fulginiti shared his dinner with

Cooper and gave him half of his turkey sub sandwich.

22. McCann believed this because he had observed that portion of the interview at the FBI Field Office on March 1 and 2 when S/A Garrett advised Cooper his fingerprints were found inside the Starbucks.

car. He went home and took a shower and did not discuss the incident with Covington or anybody else. He claimed violence was not his style, there was nothing he could do for the people in the Starbucks, and he was sorry for their deaths.

### 8. Continued Questioning in PG County on March 3, 1999.

Det. Harding then advised Cooper that Earnest had told police that Cooper was involved in a 1993 murder of a security guard, Sandy Griffin, in the District of Columbia. Cooper dipped his head a little, and agreed to talk about that. Harding read Cooper his *Miranda* rights and Cooper executed a written *Miranda* waiver. Cooper gave a verbal accounting of the Sandy Griffin murder, and then prepared a written statement.

*Statement Concerning the Murder of Sandy Griffin*

On March 3, 1999 at 9:10 p.m., Cooper commenced a written statement concerning the murder of Sandy Griffin. He stated that about five or six years ago, before he was married, he and Earnest planned to rob a security guard of his gun. The security guard was stationed in an apartment building located near 11th Street N.W. in the District of Columbia.[23] Cooper waited until the guard was distracted by the telephone. He went inside the lobby and approached the guard stating "nigga don't move, all I want is the gun." The security guard had the phone in his left hand and he placed his right hand on the revolver and cocked it while it was still in the holster. Cooper was scared and told the guard not to move. The guard removed the gun from his holster and Cooper, fearing for his life, fired his own gun and shot the security guard in the head. The security guard fell to the floor, dropping the phone and the gun. Cooper

picked up the guard's gun, a .38 revolver, and ran out with Earnest in tow. The two men ran to the car and Cooper advised Earnest that the guard tried to kill him. Cooper said he sold the guard's gun within the week for $300 to some guys on the street (he later recanted this fact in the statement concerning Monte Goodman's murder). The gun Cooper used to shoot the guard, a .32 revolver with tape on it, was later "dropped by me [Cooper] in a PG shooting case." Cooper stated it was Earnest's idea to get the gun and Cooper picked the victim.

### 9. Continued Questioning in PG County on March 3, 1999

After Cooper gave the statement concerning the murder of Sandy Griffin, McCann came into the interview room and asked Cooper if he could shed some light on a murder Cooper's friend James committed. Cooper then gave a verbal statement concerning the murder of Montee Goodman. McCann read Cooper his *Miranda* rights, and Cooper issued a written waiver. Cooper then wrote a written statement concerning the Montee Goodman murder.

*Statement Concerning the Murder of Montee Goodman*

On March 3, 1990 at 11:03 p.m. Cooper commenced the following account concerning the murder of Montee Goodman.[24] Cooper had robbed a drug dealer and was trying to sell the stolen cocaine. Later on, when Cooper was riding around and drinking beer with James, Mark and Montee Goodman, Cooper received a page on his beeper from a man named Boones or Bones ("Bones") who was interested in purchasing the cocaine for an amount less than $1,000.00. Mark and Montee overheard Cooper's conversation concerning

---

**23.** Cooper did not remember exactly where the apartment was located, but he knew it was near his mother's church located on 9th Street, N.W. He believes he parked his car on 10th Street and walked through an alley to 11th Street.

**24.** Cooper has not been charged in connection with the Montee Goodman case.

the specifics of the sale. Cooper dropped Mark and Montee off at their homes and went to his own home to wait for Bones. When Bones arrived, he told Cooper that a few moments earlier he was robbed by two men claiming to be Cooper's representatives. Cooper reimbursed Bones the stolen money, gave him the cocaine, and never dealt with him again. Cooper later established that the two individuals who robbed Bones were Mark and Montee. Cooper demanded the money back, and asked James to "whip their butts for me." Cooper was later advised that Monte had been murdered. Cooper suspected James and asked James why he did it. James advised he and Montee had been fighting and things got out of hand. Cooper instructed James to bury the gun, which he did. The gun James had was the same gun stolen from "the security guard in a D.C. homicide." Cooper then referred to his previous statement concerning the Sandy Griffin murder and advised he had lied about selling that gun to three guys in the park. Instead, Cooper had given the gun to James.

### 10. Questioning in P.G. County on March 4, 1999

The statement concerning Montee Goodman was completed shortly after midnight. At approximately 12:20 a.m., Cooper was advised by McCann and Harding that Maryland had a rule that a suspect had to be presented before a Maryland Court Commissioner within 24 hours unless the person is still assisting in the investigation. McCann asked Cooper if he still wanted to stay and talk and, if he did, whether he would waive his right of presentment. Cooper stated he wanted to continue cooperating and signed a document called a Consent Form, which stated that he had been advised of his right of presentment but wished to remain at the PGCID. Cooper then issued a short correction to his statement concerning the shooting of Officer Howard and went to sleep at approximately 12:40 a.m.

McCann saw Cooper again at approximately 12:50 p.m., read Cooper his *Miranda* rights and Cooper signed a written waiver. Cooper was advised that Covington had been arrested and was adamantly denying involvement in the Starbucks murders. While Covington acknowledged he knew one of the victims in the Starbucks case, McCann felt that Covington could not have been involved in Starbucks because at the time he was recovering from severe gunshot wounds to the stomach. Cooper then said "sit down, Joe. Let me tell you." Tr. (1/13/00) at 159:4–5. Cooper advised that Covington was not involved in Starbucks and that Cooper acted alone. McCann testified that Cooper appeared relieved and resigned to the fact that the truth was coming out. Harding read Cooper his rights and Cooper signed a written *Miranda* waiver. He then wrote his third and final statement concerning Starbucks.

### Third Statement Regarding the Murders at Starbucks

Cooper gave a third written statement about the Starbucks incident on March 4, 1999, commencing at 4:35 p.m. In this statement he claims Covington did not participate at all. Cooper planned to rob the Starbucks about one month earlier. He told Earnest of his plans without going into detail. One Sunday morning he went to the store to make sure Starbucks was doing a lot of business. Cooper believed that businesses open on Sunday do not deposit their cash until Monday morning. He decided to rob the Starbucks that Sunday evening. He paged Earnest but was unable to reach him. He decided to go alone because it was getting late and he did not want to miss his "window of opportunity." He was wearing black jeans, a black t-shirt with a white design of a person's face, white gym socks, black Timberline boots, no gloves and no mask. He drove his mother's car to the scene and parked it a block away. He entered the Starbucks through an open door, pulled two guns (a .38 and a .380), and announced

**18**

he was robbing the place. A white female identified herself as the manager. There were two other male employees, one black and one white. Cooper attempted to force everyone into the back room where the safe was located but the female employee would not comply so he fired a warning shot into the ceiling. The female attempted to run. Cooper caught her near the door and fought with her to get the keys. The female attempted to grab the .380 pistol (the .38 was in Cooper's waistband) and it went off. Cooper stated "everything else [was] like a dream" and he just started shooting. He shot the woman two or three times with the .380 and then once with the .38. The white man tried to run but Cooper shot him. The black man was injured and crying. Cooper said he had to stop the man's pain so he shot him two more times in the head. He left the store without any money because he realized what had happened and he just wanted to run. He buried the guns in a plastic bag outside St. Anne's Infant Home. He wasn't sure if he had blood on his clothes but he tasted the girl's blood in his mouth so he washed his clothes to be on the safe side. He took his car to the car wash. A while later, after he lost his job at Wang, Cooper tried to retrieve the buried guns because he was "thinking about doing robberies again to make money," but could not find them. Cooper claims he lied about Covington's involvement because he did not want to go jail. He was worried because he "killed three people and I'm afraid of jail."

**11. Continued Questioning in PG County on March 4 – 5, 1999**

After giving the final Starbucks statement, Cooper took a shower and changed his clothes. He was questioned further about the whereabouts of the guns used in Starbucks, but Cooper gave several different stories. At approximately 2:00 a.m., Cooper was brought to processing so he could be presented before the Commissioner. McCann and Harding both testified that throughout the entire time in PG County (from March 2 through March 5, 1999) Cooper received plenty of sleep, food and drink, and opportunities to use the bathroom facilities. Cooper never asked for a break or mentioned he was tired. He never complained of being sick, except to say once he felt nauseous because of the trouble he was in. He was not cuffed or restrained in any way, there was no use or threat of force. He never mentioned a lawyer, and was eager to talk. McCann testified that Cooper was intelligent, never appeared confused about the discussions they had, and was highly articulate.

**12. Questioning on March 8, 1999 in PG County**

Cooper was presented to a Maryland Commissioner and transported to the PG County Jail in the early morning hours of March 5, 1999. He remained there until March 8 at approximately 7:05 p.m., when McCann and Fulginiti were contacted by the Department of Corrections to pick up Cooper at the jail and transport him to PGCID for further interviewing. The purpose of the interview was to see if there was any additional information, especially with respect to the location of the guns used in the Starbucks murders. Cooper advised Fulginiti, "no disrespect to you or anyone ... I've had a visit from my wife, and she advised me that she had or was attempting to get an attorney." Tr. (1/13/00) at 24:3–6. Cooper was presented with a *Miranda* waiver form and he checked off that he did not wish to speak without any attorney. The officers thanked Cooper for his cooperation and he was not questioned further.

**13. Cooper's Return to the District of Columbia on March 16, 1999**

On March 16, 1999, Cooper waived his right to a removal hearing in Maryland and agreed to be transported back to the District of Columbia to answer murder charges in the Superior Court of the District of Columbia. S/A Garrett picked up

Cooper in PG County and brought him back to the FBI Washington Field Office.[25] As he went through the booking process, Cooper started talking about his experiences at PG County Jail and compared his positive experience with PG County jail to his negative experience with DC Jail. He discussed the situation involving the murder of Montee Goodman. Garrett advised Cooper the procedure from that point forward—that he would be taken to the central cell block, presented before a judge the next morning, and ultimately he would be appointed a lawyer and have a preliminary hearing. Cooper told Garrett that he knew what a preliminary hearing was. Cooper then advised Garrett that in PG County he "admitted to everything under the sun, whatever they told me to say I said. They didn't advise me of my rights." Tr. (1/12/00) at 88:16–19. Cooper said his statements will be suppressed and that he "know[s] a little bit about the law." *Id.* at 90:3–4. Cooper stated that PG County wanted him to "confess to everything to hurt the careers of Detective Trainum, [S/A Garrett and Mr. Wainstein]." *Id.* at 90:20–23. He said McCann showed him a notepad containing false comments from all his confederates. Cooper also stated that everything he said about the Starbucks murders had been "embellished." *Id.* at 91:2–7. Cooper denied his involvement in the Starbucks case and said the police would have to prove the evidence to him before he admitted to anything.[26] Garrett then presented Cooper with a waiver of *Miranda* rights form, but Cooper refused to sign it, writing instead "Decline sign form. Requested a lawyer at 3:47 p.m." Cooper was not questioned fur-

ther and was presented the next day in the Superior Court of the District of Columbia.

### B. Analysis

Cooper seeks to suppress all of his verbal and written statements. Through counsel, he claims he asserted his right to remain silent and his right to an attorney twice in the District of Columbia: once during the March 1–2, 1999 interview at the FBI Field Office, and once at the extradition hearing on March 2. He also claims his statements were involuntary and the product of coercion, duress, and deceit. He argues that the coercion, under a totality of the circumstances analysis, began from the moment he was taken into custody by the FBI on March 1 through his presentment before a Commissioner in Maryland on March 5, nearly 80 hours later.

### 1. Assertion of Rights in the District of Columbia

#### a. FBI Field Office

 Cooper claims he revoked his *Miranda* waiver and asserted his Fifth Amendment right to remain silent at the FBI Field Office at approximately 11:24 p.m. (approximately three hours into the interview with S/A Garrett) when he became upset and said he was ready to go to PG County.[27] The conversation is summarized in the FD–302 prepared by S/A Yanta, adopted by S/A Garrett, and also signed by S/A Oxley and Det. Trainum:

At approximately 11:24 PM, COOPER became emotional and said, "I'm ready to go. I'm ready to get this over with. Take me back, please [to P.G. County].

---

25. The interview was conducted by S/A Garrett, however, Det. Trainum was in another room monitoring the interview and taking notes. Trainum's notes were adopted by Garrett and were admitted into evidence at the hearing on the motion to suppress statements.

26. Garrett took this to mean that "if the evidence was clearly there that he did it, that he's going to own up and say [he] did it." Tr. Jan. 12, 2000 at 93:4–7.

27. Cooper also makes an argument in his pleadings that his rights were violated when he was questioned at the FBI Field Office despite his refusal to answer questions. There is nothing to indicate that Cooper refused to answer questions. On the contrary, Cooper initiated discussion with S/A Garrett when he stated during the booking process that he wanted to take a polygraph test.

I don't care anymore. Take me out to P.G." SA Garrett asked COOPER if he was still willing to take a polygraph. COOPER responded, "I just want to go back. I'm in it for life. I'm in dirt. Every time somethin' goes down, I'm in it. I'm destined to do dirt. I quit. I know what I've done. I'm constantly trying to defend myself, defend my name. I may as well go out and do the things people think I'm doin.' I didn't do it [re: the shooting of the off-duty P.G. County police officer]. I didn't do this shit, but it's still poppin' up on me [re: Starbucks]. I just wanna get locked up I ain't got [a] job. I have things I have to do now .... [my] "reputation" is no longer in good standing. Talkin' to you isn't gonna help me out. I'm tired. I'm tired of the bullshit. I can't do right. I didn't do shit. I didn't do this shit. I didn't do the P.G. shit. You're takin' my family away from me." FD-302 at 8–9 (brackets in original).

S/A Garrett testified that during this time, Cooper was emotional and appeared "defeated." S/A Yanta testified that Cooper was crying, but not sobbing. Garrett testified that this behavior is common in people who want to tell the truth.

The appropriate standard for determining whether Cooper invoked his right to remain silent is whether a reasonable officer would understand Cooper's statement that he wanted to go back to PG County as an indication that Cooper wished to cut off questioning. In *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court of the United States held that a defendant's statement, made an hour and a half into the interview, "maybe I should talk to a lawyer" was not sufficiently clear to establish defendant had invoked his right to counsel.[28] The Court held, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* at 459, 114 S.Ct. 2350. The Supreme Court also held that while it is "good police practice" for officers to clarify an ambiguous statement, the Court declined "adopt a rule requiring officers to ask clarifying questions." *Id.* at 461–62, 114 S.Ct. 2350. Here, Cooper's statement that he wanted to go back to PG County was at best an ambiguous assertion of his right to remain silent. A more natural interpretation is that Cooper was engaging in conversational give-and-take and was not attempting to communicate a desire to remain silent. Certainly, Cooper did not remain silent after he said he wanted to go to PG County. Instead, he continued to talk about his innocence and his destiny.

**28.** Although *Davis* concerns the right to counsel recognized in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Circuit Courts reaching the issue have held that *Davis* also applies to the right to remain silent. *See United States v. Mikell*, 102 F.3d 470, 476 (11th Cir.1996) (holding that in light of *Davis*, "a suspect must articulate his desire to end questioning with sufficient clarity so that a reasonable police officer would understand that statement to be an assertion of the right to remain silent," and "if the statement is ambiguous or equivocal, the police have no duty to clarify the suspect's intent" in case where suspect answered some questions but refused to answer others, and officers probed him on questions he refused to answer); *United States v. Banks*, 78 F.3d 1190, 1198 (7th Cir.1996) *vacated and remanded on other grounds, United States v. Mills*, 122 F.3d 346 (7th Cir.1997) (reaffirming holding in *Banks* that defendant's invocation of right to remain silent was ambiguous and equivocal). *Cf. United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995) (citing Circuit precedent for the holding that defendant's statements that the police had all the evidence against him and he didn't need to say anything fell "far short of a clear or unequivocal expression of the right to remain silent" but citing *Davis* for the proposition that "it is often good police practice to attempt to clarify whether or not the suspect is actually invoking his rights."). The First and Second Circuits indicated no need to reach the issue, but a fair reading of these cases suggests that in the appropriate situation these Circuits would apply *Davis* to the right to remain silent. *See Bui v. DiPaolo*, 170 F.3d 232 (1st Cir.1999); *United States v. Ramirez*, 79 F.3d 298 (2d. Cir.1996).

When the entire discussion is taken in context, it is far from clear that Cooper was invoking his right to remain silent. Rather, it was reasonably interpreted by Garrett as an indication of hopelessness and despair and, based on Garrett's experience, Cooper's desire to tell the truth about what he had done.

#### b. *Extradition Hearing*

Cooper argues he invoked his Fifth Amendment right to remain silent and his Sixth Amendment right to the presence of counsel at the extradition hearing. At that hearing, Cooper's court appointed attorney advised the Court he was asserting Cooper's rights under the Fifth and Sixth Amendment on all matters.

The government claims Cooper did not assert his rights at the extradition hearing because (1) the Sixth Amendment right to counsel does not attach at extradition, and (2) he was not engaging in custodial interrogation for the purposes of the Fifth Amendment at the time he allegedly invoked his rights.

#### 1. Sixth Amendment

■■■ The Sixth Amendment to the United States Constitution states "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." The Supreme Court has held that once the Sixth Amendment right to counsel has attached and has been invoked by the defendant, the police may not initiate a custodial interview of the defendant without the presence of counsel. *See Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). And, once the right has been properly invoked, any waiver by the defendant during police initiated interrogation is invalid. *See id.*

■■■ The Sixth Amendment right to counsel is offense specific. "It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, 'at or after the initi-

ation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (quoting *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)).

■■■ Cooper acknowledges the Sixth Amendment right to counsel does not extend to extradition hearings, which are not considered criminal proceedings. *See De-Silva v. DiLeonardi,* 181 F.3d 865, 868 (7th Cir.1999); *Judd v. Vose,* 813 F.2d 494, 497 (1st Cir.1987). *Cf. McDonald v. Burrows,* 731 F.2d 294, 297 (5th Cir.1984) (extradition hearing is not criminal proceeding for purposes of Sixth Amendment right to speedy trial). Cooper relies on *Chewning v. Rogerson,* 29 F.3d 418, 421 (8th Cir.1994) for the proposition that lie asserted his right to counsel not for extradition, but for all subsequent events where the Sixth Amendment right to counsel would be applicable. In *Chewning,* a formal criminal complaint was issued against the defendant on murder charges in Iowa. The defendant was arrested on a fugitive warrant in Utah, and stated that he wanted an attorney. A public defender talked to the defendant for five minutes and explained extradition, then appeared on defendant's behalf at that extradition hearing. The attorney later stated he did not discuss the murder charge in Iowa with the defendant, and his representation was limited to the question of extradition. The *Chewning* Court held that although the initiation of charges in Iowa triggered the Sixth Amendment protections, "an appearance at an extradition hearing, without any other supporting evidence [that defendant considered the public defender's appearance at extradition to extend to the murder charge, is not] a positive enough assertion to amount, as a matter of law, to an invocation of the Sixth Amendment right to counsel." *Id.* at 422.

Cooper's argument fails for several reasons. First, even though formal charges

were apparently pending, *see* Govt.Exh. 17, there is no evidence Cooper stated his intention to have Juarez, or any other lawyer represent him in that, or any other matter. Second, and more important, even if Juarez's appearance at the extradition hearing did somehow trigger Cooper's Sixth Amendment rights, Cooper clearly waived those rights after he voluntarily initiated contact with the PG County police. *See infra.* Section IB2.

### 2. Fifth Amendment

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by what has been termed *Miranda* warnings advising the defendant he has the right to remain silent and also to the presence of an attorney during questioning. If the accused indicates he wishes to remain silent, the interrogation must cease. If he requests counsel, the interrogation must cease until counsel is present. *See Edwards v. Arizona*, 451 U.S. 477, 481, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If the police fail to abide by these safeguards, any statements which are the product of police initiated interrogation may not be used against the accused in the prosecution's case in chief. *See id.* at 484, 101 S.Ct. 1880. The exception to this is if the accused "himself initiates further communication, exchanges or conversations with the police" after he has invoked his right to remain silent or to the presence of an attorney. *Id.* at 485, 101 S.Ct. 1880. The Fifth Amendment right to counsel is not offense specific. "Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present." *McNeil*, 501 U.S. at 177, 111 S.Ct. 2204.

Cooper claims he invoked his Fifth Amendment right to remain silent and to have an attorney present during questioning through his counsel at the extradition hearing. The government argues that Cooper could not have invoked his Fifth Amendment rights at the extradition hearing because the Fifth Amendment only applies during custodial interrogation and extradition proceedings are not custodial interrogation.

In *McNeil*, the defendant was arrested and charged with armed robbery. Defendant asked for and was granted counsel at the bail hearing on the armed robbery charge. Subsequent to the bail hearing, the defendant was interrogated repeatedly by officers concerning other crimes and he eventually made incriminating statements. The statements were used against the defendant and he was convicted at trial. He filed a petition for a writ of habeas corpus, arguing that his request for an attorney at the bail hearing was sufficient to invoke his Fifth Amendment right to have counsel present during police-initiated interrogation. The Supreme Court rejected the defendant's argument, stating that there must be "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil*, 501 U.S. at 178, 111 S.Ct. 2204.

The *McNeil* majority, in a footnote, responded to the dissent's concern that defendants will try to circumvent the *McNeil* holding by explicitly invoking the Fifth Amendment right to counsel at preliminary hearings. The Court noted

We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than custodial interrogation. . . . If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification of a suspect. Most rights must be asserted when the government seeks to take the action they protect against. The fact that we have allowed the *Miranda* right

to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation with similar future effect. . . .

*Id.* at 182 n. 3, 111 S.Ct. 2204 (internal citations and quotations omitted). The footnote strongly suggests, although not definitively, that a request for counsel under *Miranda* must be made within the custodial context and not at arraignment or other such proceedings. The Third Circuit recently refused to extend the *Miranda* right to counsel to a defendant who had stated in a written form given to the public defender's office that he wished to invoke his *Miranda* rights. The written form was executed during a meeting with a representative of the public defender's service in the defendant's jail cell. The Court held this was not custodial interrogation. In discussing the *McNeil* footnote, the Court noted, the "antipathy expressed in *McNeil* towards the anticipatory invocation of the *Miranda* rights is consistent with *Miranda*'s underlying principles. . . . To allow an individual to interpose *Miranda* in a situation outside the custodial interrogation would represent an unwarranted extension best left to the discretion of the Supreme Court." *Alston v. Redman,* 34 F.3d 1237, 1246 (3d Cir.1994).

A reading of cases from other jurisdictions, however, seems to indicate the *Miranda* right to counsel may be invoked in a non-custodial setting where it is known that the defendant will be subsequently interrogated. In *United States v. Wright,* 962 F.2d 953 (9th Cir.1992), the defendant was arrested while fleeing the scene of a robbery. He requested counsel at his arraignment, and subsequently entered a plea of guilty to armed robbery. At the plea hearing, the defendant's attorney advised she wanted to be present during any interviews of her client and was so present when the probation office interviewed the defendant. A few weeks later, the defendant was questioned, without the presence of his attorney, concerning bank robberies in other jurisdictions. The defendant made incriminating statements in response to this questioning. He argued that his counsel's statement at the plea hearing was sufficient to invoke his *Miranda* right to counsel during subsequent interrogation. The Court rejected his argument, relying on *McNeil'* s holding that *Miranda* rights may not be invoked anticipatorily outside the context of custodial interrogation. *See Wright,* 962 F.2d at 954. However, the Court left open the question of whether a suspect can anticipatorily invoke his *Miranda* right to counsel when both the suspect and counsel know that the suspect will be questioned on other matters, and the suspect advises counsel he wishes the presence of an attorney during this questioning. The Court did not reach that issue because neither the defendant nor his attorney indicated that either had discussed the possibility of further interrogation on separate crimes.

In *United States v. Kelsey,* 951 F.2d 1196 (10th Cir.1991), the defendant arrived home one night to find law enforcement officers searching his home. The defendant was searched, advised he was under arrest, and made to sit on the sofa while the police finished their search. The defendant repeatedly asked to see his lawyer, to which the police responded that if they allowed the defendant to see his lawyer they would not be able to ask him any questions and then he would have to go to jail. The defendant expressed his desire not to go to jail and the police officers promised leniency if he cooperated with them. Although not questioned at that point, the defendant was later questioned in his home and he gave incriminating statements. The Court held the statements were taken in violation of defendant's *Miranda* right to counsel. Despite the fact that defendant was not in custodial interrogation when he invoked his right to counsel, the Court held the fact that it was "clear from the exchange between [the defendant] and the police . . . that the police intended to question [the defendant]

at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning" was sufficient to invoke the *Miranda* right to counsel. *Kelsey*, 951 F.2d at 1199.

Finally, in *United States v. LaGrone*, 43 F.3d 332 (7th Cir.1994), the Court, noting its agreement with the *Alston* court, held that "in order for a defendant to invoke his *Miranda* rights the authorities must be conducting interrogation, or interrogation must be imminent." *Id.* at 339.

Cooper argues that when Juarez made the representations at the extradition hearing Juarez knew Cooper might be charged with the Starbucks murders, and Juarez intended to invoke Cooper's Fifth Amendment rights as to questioning on Starbucks or any other matter. According to Cooper, questioning in PG County was imminent because the FBI, Maryland and District of Columbia authorities were all working in tandem on the investigation into Starbucks and various other criminal activities. However, the Court need not reach the issue of whether Cooper had a reasonable expectation of continued interrogation and whether this expectation would satisfy any "imminent interrogation" standard because it is crystal clear that it was the defendant, Carl Cooper, who initiated discussions with the PG County police.

### 2. Cooper's Initiation of Questioning by Maryland Police

In *Edwards v. Arizona*, the Supreme Court held that once an accused has invoked his right not speak without the presence of counsel, the police may not interrogate him unless the accused himself initiates the interrogation. *See Edwards*, 451 U.S. at 484, 101 S.Ct. 1880. In *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Supreme Court held that in order to show initiation, defendant must have said something to the police officer that "evinced a willingness and a desire for a generalized discussion about the investigation ... and not merely

a necessary inquiry arising out of the incidents of the custodial relationship." *Id.* at 1045–46, 103 S.Ct. 2830. In *Bradshaw*, the defendant's inquiry to police officers of "what is going to happen to me now?" was sufficient to initiate interrogation.

█ Cooper initiated the interrogation with PG County police officers. When he was being transported in the car to Maryland, he began talking about the Starbucks case and how he was unhappy with the FBI and Det. Trainum. He asked if he could take a polygraph test in Maryland. Although the police did not question him at that time, it was clear Cooper wanted to talk.

█ When Cooper arrived at PGCID and was being asked routine booking questions, Cooper continued to talk about Starbucks and his perception that Det. Trainum was trying to pin the Starbucks crime on him. He again expressed his desire to take a polygraph test. In fact, Cooper himself acknowledged that he initiated the conversation with McCann. The following dialogue occurred between McCann and Cooper at approximately 4:20 p.m. on March 3, 1999:

McCann: Carl, do you remember when I first met you in the interview room yesterday?

Cooper: Yes.

McCann: Did you begin talking about Starbucks and other crimes at that time?

Cooper: Yes.

McCann: What was I talking to you about when you started talking about Starbucks?

Cooper: You were just asking me my name, address, height, weight, etc.

McCann: Why were you so anxious to talk about Starbucks?

Cooper: Initially I wanted to take a lie detector to show that I wasn't involved. Also, when I knew my name was out there, I wanted to set the record straight.

McCann: Before we continued talking, did I advise you your *Miranda* rights?

Cooper: Yes.

McCann: Did you understand your rights as I explained them to you?

Cooper: Yes.

McCann: Did I attempt to question you about any crimes before you initiated talking about Starbucks?

Cooper: No. I just couldn't keep it inside, I needed to talk about it. I had been wanting to talk to somebody about it for a long time.

Govt.Exh. 24 at 1–2. That conversation occurred during a question and answer session which was recorded verbatim by McCann. Cooper read and initialed each answer. There is no indication that Cooper was confused or did not understand the questions McCann asked him. McCann testified that Cooper was very eager to talk to him, and was an extremely intelligent and articulate individual who never expressed confusion or an inability to understand what was happening at any given point in time. There is nothing to refute the overwhelming evidence that Cooper initiated the contact with PG County on his own volition, and not in response to any prodding by the police officers.[29]

### 3. *Cooper's Claims of Coercion, Duress and Deceit*

Cooper argues his statements were involuntary because they were the product of coercion, duress and deceit on the part of the FBI, Metropolitan Police Department, and the PG County Police Department. He makes several arguments, to be considered in their totality, in support of his position. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.").

### a. *Joint Task Force*

 Cooper's argument centers around his theory that the Joint Task Force operated in some sort of collusive effort to obtain a confession from Cooper about the Starbucks murder. His argument is that the media was present at the time of his arrest, that S/A Garrett brought up Starbucks even though Cooper had been arrested on a Maryland charge, that the FBI kept pressing him even though he denied involvement in Starbucks, and that once he got to Maryland, PG County officers questioned him about Starbucks. He also claims the United States was committed to prosecuting him on the Starbucks case at the time he was arrested on the Maryland charge.

The fact that a Joint Task Force existed says nothing about collusion. It was completely reasonable, in fact expected, that the FBI, Maryland and District of Columbia officials would work together and share information in an investigation that included crimes committed in all three of these jurisdictions. There is no evidence that Cooper was threatened with a federal in-

---

**29.** At argument on the motion to suppress, defense counsel urged the Court to consider separately Cooper's March 3, 1999 statement regarding the murder of Sandy Griffin because Cooper did not initiate contact concerning that incident. The evidence shows that Det. Harding told Cooper that Earnest had implicated Cooper in a crime involving the 1993 murder of a security guard (*i.e.,* Sandy Griffin). Cooper agreed to talk about that incident and then signed a *Miranda* waiver. Prior to that time, Cooper had issued several other *Miranda* waivers and gave several state- ments concerning the robbery and shooting of Officer Howard, robberies of a massage parlor, bank and pizza shop, and two of the three statements concerning the Starbucks murders. There is no constitutional infirmity concerning the Griffin statement. Once Cooper initiated contact and waived his rights, there is no requirement that he know in advance of interrogation all of the relevant topics upon which he could be questioned. *See Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

dictment[30] or with the possibility of a death sentence.[31]

When Cooper was brought to the FBI Field Office, he stated during the booking process that all the evidence against him was circumstantial and he wanted to take a lie detector test. S/A Garrett took this as a clear indication that Cooper wanted to talk. Garrett told Cooper he was being charged with the shooting of an off duty police officer. Cooper denied his involvement in that incident. Garrett asked him if he wanted to talk about Starbucks. Cooper agreed. At that point, Garrett read Cooper his *Miranda* rights, and Cooper waived them and signed a written waiver. This would be the first of many *Miranda* waiver forms which Cooper would execute.

There is nothing to indicate that at any point during the approximately seven-hour interview at the FBI Field Office the atmosphere became coercive, or that Cooper was forced to talk. On the contrary, the evidence shows that Cooper is unusually verbose, unusually eager to participate, and anxious to talk. This is consistent with Cooper's behavior throughout the entire process. He was anxious to take a lie detector test. He was anxious to talk to Garrett at the FBI Field Office. He was anxious to talk to the PG County officers both in the car on the way to Maryland and at the PGCID. Even though the PG County officers repeatedly told Cooper they were investigating the shooting of Officer Howard, Cooper kept insisting they talk about Starbucks. At no time did Cooper ever indicate he did not want to talk.[32]

*b. Eighty Hours in Custody*

▮ Cooper was arrested on the Maryland charges at approximately 6:30 p.m. on March 1, 1999. He was not presented before a Maryland Commissioner on the Maryland charges until approximately 2:00 a.m. on March 5, nearly eighty hours later. Cooper alleges this delay in presentment resulted in a violation of 18 U.S.C. § 3501(c).[33] The government argues that

30. *See supra,* n. 11, and accompanying text.

31. In his motion to suppress statements, Cooper states "throughout his [Cooper's] interrogation and custody in Maryland, the following representations were being made to him: (a) if you are convicted of these offenses you will get the death penalty." Mot. to Suppress at 6–7. The record is devoid of any evidence that Cooper was threatened with the death penalty. There is absolutely no mention of it in connection with the questioning by PG County officials. Cooper's attorneys questioned S/A Yanta and S/A Garrett as to whether AUSA Kenneth Wainstein ever mentioned the death penalty, or penalties in general, to Cooper during the period of time on March 2, 1999 when Wainstein spoke to Cooper in the presence of those agents at the FBI Field Office. Both Garrett and Yanta advised they do not recall the subject of penalties, or the death penalty, being mentioned.

32. The fact that Cooper wanted to talk is highlighted by Cooper's written statement made March 4, 1999 in response to Det. Harding's request for Cooper to describe his relationship with Harding and Sgt. McCann:

I have a lot of respect for the two Det. They've fed me and treated me with respect. I've wanted to admit this ever since it's happened. It had to be known. I wanted to talk. Every time I tried to talk to Det. Trainum, he treated me like shit and harassed my family. If he would have shown me an ounce of respect, this would have been over for more than a year.... Like I said, if he [Det. Trainum] would have shown me he respected me as a person, like P.G. did, this would have been over a long time ago.

Government's Exhibit 36 at 12–13.

33. 18 U.S.C. § 3501(c), states

In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six

§ 3501(c) is not applicable because Cooper was arrested on a state offense.

In *United States v. Alvarez–Sanchez*, 511 U.S. 350, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994), the United States Supreme Court held the provisions of § 3501(c) are not triggered if a "person is arrested and held only on state charges by state or local authorities." *Id.* at 358, 114 S.Ct. 1599. This is true, the Court reasoned, even if the state authorities have reason to believe the person in custody may have violated federal law. Although the Court noted that "when the arrest is for a violation of state law, [the arresting officers] almost certainly will be agents of the state or one of its subdivisions," *id.*, the Court did not address whether the same rule applies if, as in Cooper's case, the defendant has been arrested by federal authorities on a state charge. The Court stressed, however, that the "duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense." *Id.* In *United States v. Fullwood*, 86 F.3d 27 (2d Cir.1996), the defendant was arrested by state authorities on a federal warrant. The issuance of the federal warrant resulted in a violation of defendant's state supervised release status, which would have authorized his detention by the state. The arresting officers testified they believed the defendant was in state custody. The Court held that § 3501(c) applies when a defendant is being held by state authorities on both state and federal charges. The Court observed, "[t]he touchstone of determining the applicability of § 3501(c), therefore, is the governmental source of the charge underlying the arrest, *not the law enforcement agency involved.*" *Id.* at 31 (emphasis added).

In *United States v. Headdress*, 953 F.Supp. 1272 (D.Utah 1996), the Court addressed this issue in connection with a murder near an Indian reservation. Defendant Ankerpont was initially arrested by a BIA Officer and charged with a tribal offense, which is not a federal charge. The defendant was questioned and gave statements to BIA and FBI agents. Defendant was charged the next day with a federal offense, and was not presented to a magistrate judge until two days later. Defendant moved to suppress his statements on the basis, among others, of the delay in presentment under § 3501(c). The Court held that § 3501(c) had no application because the defendant gave his statements before he was arrested on the federal offense. The Court reasoned,

> [i]f an Indian is arrested for a tribal offense there is nothing a federal court can do about the matter. Even if a BIA officer has made a "federal arrest," there is still no "federal jurisdiction" and no federal charge. Therefore, as Justice Thomas observed in *United States v. Alvarez–Sanchez, supra,* the "duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense. Until a person has been arrested for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer 'empowered to commit persons charged with offenses against the United States,' and therefore, no 'delay' under § 3501(c) can occur". 511 U.S. at 358, 114 S.Ct. at 1604 (emphasis added).

Of course the Court is concerned by the length of time during which Cooper was held without being presented to a Maryland judicial officer.[34] But the Court

---

hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

**34.** This is especially so in light of the fact that Cooper was not timely presented before a judicial officer in Maryland. Md.Rule 4–212(e) states, in relevant part, "the defendant shall be taken before a judicial officer ... without unnecessary delay and *in no event later than 24 hours after arrest.*" (emphasis

agrees that without a federal charge there can be no obligation for prompt presentation to a magistrate under § 3501(c).[35] When the lengthy period of time is considered in the totality of the circumstances, it is clear from the entire record that Cooper's statements were voluntary. *See United States v. Yunis*, 859 F.2d 953, 961 (D.C.Cir.1988); *United States v. Van Metre*, 150 F.3d 339, 348 (4th Cir.1998).

#### c. Other Evidence Regarding Coercion

 Cooper points to other evidence in support of his claim of involuntariness.[36] He notes the interviews were not audiotaped or videotaped. Cooper acknowledges that taping is not required by the Constitution or the laws of the United States. *See Yunis*, 859 F.2d at 961. S/A Garrett testified that were he to videotape an interview he would typically do it when an individual was going to confess to a particular crime. In addition to obtaining the consent of the suspect, he would have to get permission from his supervisor and the FBI Division of General Counsel. In this case, Garrett testified he never reached the point of asking Cooper for his consent to videotape. Det. Harding testified there is no videotaping equipment available for taping interviews at the PGCID.

 Cooper also claims he was deceived into believing his fingerprints were found at the Starbucks scene. As Cooper acknowledges, police trickery concerning the false existence of a fingerprint does not render an otherwise voluntary statement involuntary. *See Lucero v. Kerby*, 133 F.3d 1299, 1312 (10th Cir.1998); *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir.1994). However, it is one factor to consider in assessing the totality of the

added). Although Cooper waived his right to be presented to a court commissioner and requested to remain at the Criminal Investigations Unit to cooperate with PG County officers, *see* Govt.Exh. 27, he did not do this until March 4, 1999 at 12:22 a.m., approximately 36 hours after he arrived at PGCID. However, the failure of law enforcement officers strictly to follow the mandate of Rule 4–212(e) does not automatically render a statement inadmissible. *See* Md.Rule 10–912(a). It is "only one factor, among others, to be considered by the Court in deciding the voluntariness and admissibility of a confession." *See* Md.Rule 10–912(b); *Woods v. State*, 315 Md. 591, 614, 556 A.2d 236, 247 (1989).

**35.** This case does not fall within the "rare scenario" described by the Supreme Court where "state and local authorities, acting in collusion with federal officers, [ ] arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment." *Alvarez–Sanchez*, 511 U.S. at 359, 114 S.Ct. 1599; *see also, Anderson v. United States*, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943) (holding that an "impermissible working arrangement existed" to circumvent federal presentment laws when state police officer, acting without a warrant and without probable cause, arrested union strikers whom he thought were involved in dynamiting federal power lines and held them for several days to allow the FBI to question and obtain confessions from them). There is no evidence in this case that the law enforcement authorities acted with the intent of violating Cooper's right to prompt federal presentment. S/A Garrett arrested Cooper on a fugitive warrant that had been issued in PG County for Cooper's arrest in connection with the shooting of Officer Howard. Garrett testified that there was nothing that motivated or precipitated the arrest of Cooper on March 1, 1999, just that "there was some concern on Prince George's County's part that Mr. Cooper was continuing to remain in the community and not arrested, because the case basically had been put together against him. So there was some motivation to arrest him because of that, because of the allegations that he had shot a police officer." Tr. (1/12/00) at 142:19–143:3.

**36.** Two of Cooper's arguments are addressed here; however, the Court has fully considered all of the points addressed by Cooper. The Court specifically notes that absolutely no evidence has been presented to support Cooper's claims (contained in his motion to suppress) that he was told by officers he would never see his son again, that he had no chance of beating the charges against him, that if he cooperated he would be home in a few years, that he had to answer questions or he would never get out of the police station, that his wife would be sleeping around if he went to jail, and that he suffered from attention deficit hyperactivity disorder.

circumstances. The Court does not find the mention of the fingerprint egregious, especially in light of the fact that Cooper had told a third party during an intercepted telephone communication that he believed his fingerprint was found in the Starbucks store. *See supra* n. 5.

▮ The Court has also considered, under the totality of the circumstances, all of the arguments made by the government. As the record fully reflects, Cooper was read his proper *Miranda* rights multiple times and additionally he waived those rights in writing multiple times. *See Yunis*, 859 F.2d at 961 ("The administration of proper *Miranda* warnings followed by a written waiver of the rights described in those warnings, will usually go far toward demonstrating that a decision to speak is not compelled."). The Court also finds highly persuasive the fact that Cooper wrote most of his own statements. He was provided privacy to do some, if not all, of these statements. The statements are extremely coherent, rational, and legible; each appears to be carefully thought out and written in a fluent manner. Although they were minimal in number, Mr. Cooper did his own cross-outs and changes. In several instances, Cooper made changes to the question and answer portion of a statement when he did not like or did not agree with his answer as recorded by the officer taking the statement. For example, in one statement, Cooper was asked why he was not watching the other two employees in the Starbucks. Cooper's answer, as recorded by Sgt. McCann, was: "That wasn't my job. 'Keith's Boy' was supposed to keep the other employees calm." Cooper added to that answer, in his own handwriting and initialed it, "my job was the lookout/driver." Govt.Exh. 24 at 8. In another statement Cooper was asked what car he drove. The answer, as recorded by Det. Harding, was "my green Ford Escort." Cooper, in his own handwriting, inserted the word "mother's" in between the words "my" and "green." Govt.Exh. 34 at 6. This demonstrates Cooper paid careful attention during the interview process, and was quick to ensure that his words and thoughts, even small details, were accurately recorded. His behavior is inconsistent with that of someone under coercion or duress.

Cooper is also no stranger to law enforcement authorities and the criminal justice system.[37] Far from being afraid of the police, he bragged about being able to manipulate them. For example, Cooper told Sgt. McCann he was able to get the Virginia police to stop investigating him by becoming very agitated and yelling at them during questioning. In another instance, when Cooper was involved in a car chase with the police, Cooper jumped out of the car, ran into a nearby church and mingled with the congregation. Cooper was able to talk the pastor into intervening on his behalf, and the pastor told the police to leave Cooper alone.

The record shows that Cooper had an easy, comfortable, familiar, confident attitude towards his "interrogators." Both on the facts and the law, there is no evidence to show Cooper's statements were anything but voluntary. Instead, they were clearly voluntary, readily and eagerly initiated, and provided free of coercion and duress. Cooper's motion to suppress statements is denied.

## II. Motion to Suppress Wire Intercepts and All Fruits Thereof

On August 19, 1998, United States District Judge Paul L. Friedman authorized a wiretap on Cooper's home telephone num-

---

37. The Court has reviewed and considered the stipulated exhibit which is currently under seal at the request of both the government and the defendant. *Cf. Washington Post v. Robinson*, 935 F.2d 282 (D.C.Cir.1991). The Court views this evidence as indicative of Cooper's knowledge and familiarity with his rights under *Miranda* and the nature of custodial interrogation. The exhibit, and the short argument concerning it will remain under seal until the conclusion of this case in the interests of justice in ensuring and maintaining a fair and impartial jury.

ber and his paging device. On September 22, 1998, Judge Friedman issued an order extending the wiretap authorization for an additional thirty days. Cooper seeks to suppress the wiretap communications and the fruits obtained from those communications on two bases. First, he argues in very general terms that "each of the [intercepted] conversations in which Melissa Cooper [Cooper's wife] is a party must be suppressed as they are protected by the marital privilege." Mot. to Suppress at 4. Second, he argues that all of the intercepted communications and their fruits should be suppressed because the government failed to comply with 18 U.S.C. § 2518 concerning exhaustion of alternate remedies. Neither party presented evidence or argument on this issue, and both have submitted on the papers.

## A. Intercepted Marital Communications

■ Several of the intercepted communications were conversations between Cooper and his wife, Melissa Cooper ("Mrs. Cooper" or "Melissa"). Other intercepted communications involved Mrs. Cooper talking with various friends and family members about her own and Cooper's possible involvement in certain crimes. Many of these communications pertain to a gun that was purchased by Melissa and allegedly used to shoot Officer Howard in Maryland. Other communications pertain to police activity concerning the Starbucks murders and other crimes, as well as Cooper's fear he was being targeted as a suspect in those crimes. Cooper does not earmark any conversations in particular or any specific communication he finds objectionable. Instead, he seeks to suppress all intercepted communications, arguing they are protected by the marital privilege.[38]

■ There are two types of marital privilege. The testimonial privilege protects one spouse from being compelled to testify against the other. This privilege "allows a spouse called as a witness against his or her own spouse in a criminal proceeding to refuse to testify." *Securities and Exchange Comm'n v. Lavin*, 111 F.3d 921, 924 (D.C.Cir.1997). This privilege can be asserted only by the testifying spouse, *i.e.*, Mrs. Cooper, *see United States v. Anderson*, 39 F.3d 331, 350 (D.C.Cir.1994), and is not relevant to Cooper's motion to suppress the intercepted communications.[39]

■ The other privilege "protects from disclosure private communications between the spouses in the confidence of the marital relationship." *Lavin*, 111 F.3d at 924.[40] The privilege does not apply, however, if the spouses are jointly participating in a crime. *See United States v. Bey*, 188 F.3d 1, 4–5 (1st Cir.1999), *United States v. Harrelson*, 754 F.2d 1153, 1168 (5th Cir.1985). The government argues the intercepted communications between Cooper and Melissa fall outside the privilege because Melissa "was personally involved in her husband's criminal activity,

---

**38.** Cooper also makes vague reference to the statute's minimization requirement, which requires wiretap interceptions to be "conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). Both orders authorizing the wire interceptions contain a provision requiring the government to minimize intercepted communications to only those pertaining to the investigation. There is no evidence the government failed to comply with this requirement.

**39.** The testimonial privilege may become relevant if Mrs. Cooper asserts her right not to testify and the government seeks to introduce her intercepted communications against Coo-

per at trial. *See* 25 Wright & Graham, *Federal Practice & Procedure,* § 5576 at 589, *et seq.* (discussing whether the testimonial privilege applies "when the spouse's out-of-court statements are offered against the defendant spouse through the testimony of some third person").

**40.** Cooper argues that all of Melissa's intercepted communications should be suppressed. However, the privilege only applies to communications between a husband and wife. Thus, Cooper may invoke the privilege only with respect to Melissa's communications with him.

specifically that she purchased guns for her husband who could not purchase them himself due to his status as a convicted felon." Opp. to Mot. to Suppress at 67.

### 1. Background

In at least two places in the August 19, 1998 affidavit submitted to Judge Friedman, S/A Garrett notes Mrs. Cooper's possible involvement in Cooper's alleged criminal activities. In one section, he states Cooper regularly used a 9 mm pistol purchased by Melissa in the State of Maryland under her maiden name, Melissa Lee Musgrove. Garrett notes that a witness had advised that Melissa was married to Cooper and living in the District of Columbia at the time she purchased the gun. *See* Aug. 19, 1998 Aff. at 17–18. In another section, Garrett notes another witness advised that Melissa "regularly" purchased guns for Cooper. *See id.* at 28.

The Court has listened to tapes of the intercepted communications which have been provided by the government to the Court and defense counsel. Most of the intercepted communications between Cooper and Mrs. Cooper consist of short conversations wherein the two discuss responding to police inquiries concerning the 9 mm gun Melissa allegedly purchased for Cooper.[41] In addition to the conversations about the gun, there was one communication where Melissa advised Cooper she received a flyer on her car concerning an incident beginning with an "S," and another communication where Cooper advised Melissa he was at Earnest's barbershop.

### 2. Analysis

■■■■ "The government must produce evidence of a spouse's complicity in the underlying, on-going criminal activity before the district court may admit testimony regarding confidential communications between husband and spouse." *Bey,* 188 F.3d at 5. The spouse's participation in the criminal activity need not be substantial. *See id; United States v. Short,* 4 F.3d 475 (7th Cir.1993) (wife aided and abetted conspiracy by advising her husband how to cover up evidence of stolen vehicles and also by helping him replace car parts on stolen cars).

The government argues the exception to the privilege applies because Melissa "knew about her husband's robbery activities, procured a gun for her husband and actively followed the course of the investigation into her husband's criminal activities." Opp. to Mot. to Suppress at 73. The tapes make clear that Mrs. Cooper knew of, or at least suspected, her husband's activities. In at least one conversation with a third party, Melissa advised that Cooper could not have been responsible for the Starbucks murders because he usually returned with money or some other fruits of a robbery and nothing was taken from the Starbucks store. In another conversation, she indicated her hope that Cooper did not use her gun during a crime.

However, the fact that Melissa knew of or suspected her husband's activities is not sufficient to overcome the privilege. There must be some sort of participation in a crime. *See United States v. Rakes,* 136 F.3d 1, 5 (1st Cir.1998) (holding that the joint participant exception to the communications privilege requires "wrongful complicity ... not innocent or involuntary action"). What does render Mrs. Cooper a joint participant is her assistance in procuring the weapon for Cooper, and her conversations with Cooper in an effort to

**41.** The police went to Melissa's mother's house in Maryland and Melissa's place of employment and inquired about the gun. When Cooper was advised by Melissa that the police were looking for the gun, Cooper called the police and attempted to direct their attention elsewhere. He advised them the gun was never brought into the District of Columbia, was kept in storage in Maryland, and it was only taken out when Melissa used it for target practice. Cooper told Melissa this story and kept her apprised of his conversations with the police. Melissa agreed to let Cooper handle the matter. The gun was eventually seized by the police under protest from Cooper and Melissa.

lie about the gun's use or whereabouts and thwart police efforts to retrieve the gun. As the Tenth Circuit has stated

It is our view the marital communication privilege does operate to prevent the testimony of one spouse against another if the sole knowledge and information and/or participation involves a conversation wherein the spouse who committed the crime discloses that fact to the other spouse. In such a case, the only connection one spouse could have with the crime would be the statement by the other spouse that he or she committed the crime. If, however, such as in the instant case, the spouse who did not conspire to or participate in the commission of the crime nevertheless thereafter, with knowledge of the fact that the other spouse did commit the crime, actively, by overt acts, participates in the "fruits" of the crime or "covers up" evidence thereof by any means, then the marital communication privilege does not apply to protect the spouse who committed the crime from voluntary incriminating testimony of his spouse who actively participated as an accessory-after-the-fact. Thus, we would apply the "crime-fraud" exception ... to those cases where the husband and wife engaged in criminal conspiracy to those cases where one spouse commits a crime and the other spouse thereafter actively participates in the fruits thereof or engages in overt acts to "cover up" the commission of the crime.

*United States v. Neal,* 743 F.2d 1441, 1446 (10th Cir.1984). Cooper's motion to suppress wire interceptions on the basis of marital privilege is denied.

## B. Alternate Means of Investigation

### I. Background

Cooper claims the application for the wire interception was deficient in that it failed to specify alternative means of investigation. On August 19, 1998, S/A Garrett applied to the United States District Court for an order authorizing wire interceptions on Cooper's home telephone and pager. In an affidavit in support of his application, Garrett discussed numerous alternative methods of investigation and why these methods had failed, appeared unlikely to succeed, or were too dangerous to employ.

Garrett stated that despite extensive media and prime time television coverage, and the existence of a special information hot-line, no eyewitnesses had surfaced. Law enforcement had obtained the cooperation of some witnesses, however, those witnesses were not fully privy to Cooper's activities. Moreover, Garrett stated potential witnesses may have been afraid to come forward in light of Cooper's reputation as being "vicious"[42] and his history of threatening "snitches."

Garrett noted that interviewing Cooper and other target suspects was unlikely to be fruitful because those individuals were unlikely to cooperate or give truthful information. The use of undercover agents was not feasible because the alleged conspiracy consisted of a small number of individuals who had close, personal relationships. These individuals would be unlikely to let a stranger get close enough to them to be of much use.

There were no fingerprints, ballistics, or other physical evidence. Because there was information that Cooper moved his guns around from place to place, and officials did not know where the guns or other evidence were located, a search warrant would not then be helpful. Pen registers and telephone toll records were used extensively during the investigation. These devices had been helpful to law enforcement in identifying the people involved and the extent of their relationships, however, they were insufficient to uncover evidence of criminal behavior.

Law enforcement agents had also attempted to use physical surveillance, how-

---

42. " 'Vicious' means in street parlance that a person has proven himself willing and ready to commit murder." Aug. 19, 1998 Aff. at 39, n. 25.

ever, Cooper resided in a high crime residential neighborhood where surveillance vehicles are easily spotted. The agents attempted to overcome this problem by inserting a remote-controlled video camera in a telephone pole outside Cooper's house. However, the camera only recorded what happened on Cooper's front doorstep. On August 19, 1998, Judge Friedman issued an order authorizing the interception of wire and electronic communications on Cooper's home telephone and pager for a period not to exceed thirty days.

On September 22, 1998, the government applied for an extension of time within which to intercept wire and electronic communications. S/A Garrett submitted another affidavit in support of the application which essentially reiterated the alternative investigative measures used, and included information on the wire interceptions to date. Judge Friedman issued an order on September 22, authorizing the interception of wire and electronic communications from the same medium for a period not to exceed thirty days.

Cooper seeks to suppress the wiretap interceptions and their fruits on the general argument that the government's "applications failed to adequately identify each of the investigative procedures that were tried and were deemed unlikely to succeed or were too dangerous." Mot. to Suppress at 3. Cooper is especially concerned the "applications for wire interceptions neglect to identify a single effort to investigate any person or entity other than Carl Cooper." Mem. to Mot. to Suppress at 6. Cooper's argument is unavailing.

*2. Analysis*

■ An application for an order authorizing interception of wire communications requires a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The purpose of this requirement, known

as the "necessity requirement," is to ensure " 'that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.' " *United States v. Johnson,* 696 F.2d 115, 123 (D.C.Cir.1982) (quoting *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225) (1974). "This purpose can be achieved ... only by 'giv[ing] close scrutiny to applications challenged for noncompliance and ... reject[ing] generalized and conclusory statements that other investigative procedures would prove unsuccessful' " *Id.* (quoting *United States v. Williams,* 580 F.2d 578, 588 (D.C.Cir.1978). The government is "not required to enumerate every technique or opportunity missed or overlooked." *United States v. Sobamowo,* 892 F.2d 90, 93 (D.C.Cir.1989). Instead, the government need only show that other techniques would be "impracticable under the circumstances." *Johnson,* 696 F.2d at 123. The government's showing must be "tested in a practical and commonsense fashion ... recognizing that wiretaps are neither a routine initial step nor an absolute last resort." *Williams,* 580 F.2d at 588 (internal citations and quotations omitted):

■ In the instant case, the government has demonstrated why other investigative techniques were impracticable. The government had been investigating Cooper's activities since September 1997, nearly one year prior to the filing of the wiretap application. During this investigation, officials utilized various investigative techniques outlined in the affidavit. The affidavit explained that while several informants had come forward and provided useful information, these informants were not close enough to Cooper to know the full extent of any criminal activity. Moreover, the government related its concern that potential witnesses were afraid to come forward in light of Cooper's reputation for being violent and for threatening snitches. The government had also attempted to build its case by offering re-

wards for information, by conducting visual surveillance, and by using pen registers and telephone toll records. And, while all of these methods had been somewhat useful, they were inadequate in light of the small circle of people involved and Cooper's extensive efforts to hide evidence of criminal activity. Because Cooper's associates numbered few, it was not unreasonable for the government to believe that after nearly one year of investigative activity it did not have enough information "to reveal the operation's full nature and scope." *United States v. Brown*, 823 F.2d 591, 598 (D.C.Cir.1987). Accordingly, the defendant's motion to suppress wiretap interceptions for failure to comply with 18 U.S.C. § 2518(1)(c) is denied.

### III. Motion to Suppress Evidence Recovered Pursuant to Search Warrant

■ On February 22, 1999, Det. Trainum applied for and received a warrant to search the residences and automobiles of Cooper and Earnest. Cooper challenges the warrant on the basis that the affidavit in support of the warrant "*may* have been derived from the wire interceptions" which Cooper claims were improper. *See* Mot. to Suppress Evid. at 1 (emphasis added). The relevant portion of the warrant application states: [43]

> Also, your affiant has recovered from Carl Cooper the gun that was used in the shooting of Ofc. Howard. On Friday, August 28, 1998, your affiant and Special Agent Garret [sic] visited the mother of Melissa Cooper, Carl Cooper's wife, and told her that we were making a routine inquiry on a 9 mm gun that her daughter had purchased in Maryland in 1996 and that we were attempting to see if it was in her possession. The affiant left his business card, which identified him as a District of Columbia Homicide detective.

During subsequent conversations with Melissa Cooper and with Carl Cooper, both offered to have the gun turned over to the affiant for examination and testing. On Thursday, September 3, 1998, the affiant and Special Agent Garrett visited the home of Melissa Cooper's grandfather in Hyattsville, Maryland as pre-arranged in order to pick up the gun. We met with Melissa and Carl Cooper, and Melissa Cooper's parents. Melissa Cooper turned over the nine-millimeter to your affiant.

Attach. I to Govt.Opp. to Mot. at 7. The application states the gun in question was determined to be the same gun used in the shooting of Officer Howard.

The Court has already ruled the statements between Mrs. Cooper and Cooper were not privileged and were properly intercepted. And, even if the information obtained from the wiretaps had been subject to the marital communications privilege, the warrant application included sufficient information independent of the wiretap interceptions that would have justified issuance of the warrant. *See James v. United States*, 418 F.2d 1150, 1152 (D.C.Cir.1969); *see also United States v. Halliman*, 923 F.2d 873, 880–881 (D.C.Cir. 1991). Nothing in the application states the information was obtained from a wiretap. In fact, in several places the application states that witnesses advised the police that Melissa purchased the gun for Cooper. For example, the application states "[a]ccording to W–2, the gun used to shoot [Officer Howard] had been purchased for Cooper by his wife, 'Missy.'" *Id.* at 6, n. 8. Another section of the application states "[a]s explained above, W–1 and W–3 said that Melissa Cooper used to buy guns for Carl Cooper, who could not purchase guns because of his status as a felon. Records from the Atlantic Guns Shop in Silver Spring, Maryland show that Ms. Cooper purchased a 9 mm handgun in her maiden name on May 1, 1996." *Id.* at

**43.** Cooper does not point to any specific passage in the application, however, the quoted passage is the only one that arguably pertains to the intercepted communications.

7. For the reasons stated, Cooper's motion to suppress evidence seized pursuant to the search warrant is denied.

### IV. Motion to Suppress Photographic Identifications

Cooper argues the government's manner of showing photographic identification arrays to witnesses "in this complex matter *may* have been unduly suggestive and therefore unreliable." Mot. to Suppress at 1 (emphasis added). Without making any specific challenges, he claims the techniques used by the government may have been unduly suggestive and seeks to "probe all relevant aspects of each pretrial identification procedure in order to assess the reliability of each procedure as a predicate to admission of each out of court identification." Mem. in Support of Mot. to Suppress at 2. At the hearing on the motion to suppress, the government introduced evidence concerning two photo identification spreads.

### A. Background

S/A Garrett testified that in April 1999 he was investigating a 1997 robbery of the Rolling Crest–Chillum Community Center in PG County.[44] On April 25, 1999 in the early afternoon, Garrett met with a witness to this robbery outside the witness' college dormitory room. Garrett showed the witness a color copy of a photo spread consisting of Cooper's photograph (photograph number three) as well as the photographs of five other black males with similar facial characteristics.[45] The witness was told to look at all the photographs and advise if any of the individuals were, or looked like, the person who robbed him. Garrett explained to the witness that the photographs were historical and to keep in mind that some characteristics, such as hair length, may have changed. The witness studied the photographs "for a while . . . and said number three is the closest . . . [and] resembles the lips, the face, to include the eyes, the beard, just the overall look of the photograph looks like the individual that robbed him in 1997." Tr. (1/12/00) at 116:9–21. The witness then put a circle around the color copy of photograph number three and initialed and dated it. Garrett testified he did not tell the witness he had identified a suspect, and did not tell the witness the name of the person he identified. Garrett did not say or do anything to suggest to the witness what photo to choose.

S/A Garrett also testified concerning a photo array he showed on November 2, 1999 to a witness who asserted he was shot in the leg by Cooper in 1995.[46] Garrett showed the witness an original photo spread consisting of Cooper's photograph (photograph number four) as well as the photographs of five other black males with similar facial characteristics.[47] The witness was told to advise if he saw in the photographs the individual who shot him in the leg, keeping in mind that facial characteristics change over time. The witness looked at the spread "for about 10 seconds and says, [number] 4, that's Carl." Tr. (1/18/00) at 64:20–22. Garrett then produced a color copy of the original and the

44. Cooper has been charged in the indictment with armed robbery and firearms offenses in connection with this incident.

45. Garrett testified a color copy was used in order to avoid having the witness mark up original photographs that might be used again in other photo arrays.

46. Garrett was recalled to the stand on January 18, 2000 prior to the close of the government's evidence. The government advised the Court that it had previously overlooked the existence of the photo spread and did not advise the defense of its existence until that morning. The defense objected to Garrett's testimony and the photo spread as irrelevant. The government advised it is not sure how or whether it will use the evidence, and the Court makes no ruling at this time as to the relevancy of the photo spread.

47. The photo array included a photograph of Myron Covington, the brother of Keith Covington. Garrett testified this was a coincidence, and he did not know at the time the relationship of the individual to Keith Covington.

witness circled number 4 and signed his name. Garrett and Det. Trainum witnessed the signature, and signed and dated their names on the back of the color copy. Garrett testified that at no time did he indicate to the witness that somebody in the photographs was a suspect, nor did he do anything to suggest to the witness which photograph to choose.

### B. Analysis

The Court conducts a two-step inquiry to determine whether an out-of-court identification violates the Due Process Clause. The Court must first determine whether the showing of the photographs was unduly suggestive. *See Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Washington,* 12 F.3d 1128 (D.C.Cir.1994). Factors to consider in assessing suggestiveness include the "size of the array, the manner of presentation by the officers, and the array's contents." *United States v. Concepcion,* 983 F.2d 369, 377 (2d Cir. 1992). If the photo array is not unduly suggestive, questions concerning its reliability go to the weight of the evidence, not its admissibility. *See United States v. Matthews,* 20 F.3d 538, 547 (2d Cir.1994).

However, if the identification evidence is suggestive, the suggestiveness alone does not "violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite,* 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In the event an identification procedure is determined to be suggestive, the Court must conduct a second inquiry to determine whether the "identification was sufficiently reliable to preclude a substantial likelihood of misidentification." *Washington,* 12 F.3d at 1134. The factors to be considered in determining whether an identification is reliable include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."

*Manson,* 432 U.S. at 114, 97 S.Ct. 2243; *Neil,* 409 U.S. at 199–200, 93 S.Ct. 375.

Here, neither identification process was unduly suggestive. The witnesses were shown arrays consisting of the photographs of six individuals who had remarkably similar characteristics. *See United States v. Gantt,* 617 F.2d 831 (D.C.Cir.1980) (upholding district court's finding that photo array of six individuals with similar characteristics was not unduly suggestive). Each of the individuals in the two arrays had similar skin color. Each had almost exactly the same hair style. In the first array, it appears that five of the six individuals had mustaches; in the second array all six had mustaches. No one person in either array looks unique or substantially different from the others. There is no evidence that the witnesses in either identification procedure were told who to select, or were provided with information that would have lead them to select a specific individual. Because the photo arrays were not unduly suggestive, the Court need not reach the issue of reliability. Defendant's motion to suppress photographic identification is therefore denied.

### V. CONCLUSION

For the reasons stated, it is hereby

ORDERED that defendant's Motion to Suppress Custodial Statements is hereby denied; and it is

FURTHER ORDERED that defendant's Motion to Suppress Wire Interceptions and All Fruits Thereof is denied; and it is

FURTHER ORDERED that defendant's Motion to Suppress Evidence Recovered Pursuant to Search Warrant is denied; and it is

FURTHER ORDERED that defendant's Motion to Suppress Photographic Identifications is denied.

IT IS SO ORDERED.